Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/08/2016 09:06 AM CDT

Burton P. Lingenfelter, appellant,
v. Lower Elkhorn Natural
Resources District, appellee.
___ N.W.2d ___

Filed July 8, 2016.    No. S-14-1112.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or
   final order rendered by a district court in a judicial review pursuant to
   the Administrative Procedure Act may be reversed, vacated, or modified
   by an appellate court for errors appearing on the record. When review-
   ing an order of a district court under the Administrative Procedure Act
   for errors appearing on the record, the inquiry is whether the decision
   conforms to the law, is supported by competent evidence, and is neither
   arbitrary, capricious, nor unreasonable.
2. **Judgments: Appeal and Error.** An appellate court, in reviewing a dis-
   trict court's judgment for errors appearing on the record, will not substi-
   tute its factual findings for those of the district court where competent
   evidence supports those findings.
3. ____: ____. Whether a decision conforms to law is by definition a
   question of law, in connection with which an appellate court reaches a
   conclusion independent of that reached by the lower court.
4. **Administrative Law: Statutes: Appeal and Error.** To the extent that
   the meaning and interpretation of statutes and regulations are involved,
   questions of law are presented which an appellate court decides indepen-
   dently of the decision made by the court below.
5. **Constitutional Law: Ordinances: Appeal and Error.** The constitution-
   ality of an ordinance presents a question of law, in which an appellate
   court is obligated to reach a conclusion independent of the decision
   reached by the trial court.
6. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality
   of a statute presents a question of law, which an appellate court indepen-
   dently reviews.

7. **Constitutional Law: Administrative Law: Natural Resources Districts: Appeal and Error.** The constitutionality of a rule adopted by a natural resources district presents a question of law, which an appellate court independently reviews.

8. **Administrative Law: Appeal and Error.** A district court, in applying a de novo standard of review, can consider and may give weight to the fact that the hearing officer observed the witnesses and accepted one version of the facts rather than another.

9. **Estoppel.** The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to one's detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.

10. **Administrative Law: Natural Resources Districts: Words and Phrases.** A natural resource district is not an agency within the meaning of the Administrative Procedure Act, Neb. Rev. Stat. § 84-901 et seq. (Reissue 2014).

11. **Constitutional Law: Due Process.** Substantive due process requires a determination whether a right in which the plaintiff has a legitimate property interest is at issue and, if it is, whether that right was unconstitutionally taken from the plaintiff.

12. **Due Process: Property: Public Health and Welfare.** To establish a substantive due process violation, the government's land-use regulation must be clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

13. **Constitutional Law: Equal Protection.** The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges.

14. **Equal Protection.** The Equal Protection Clause requires the government to treat similarly situated people alike.

15. ____. The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

16. **Legislature: Equal Protection.** If a legislative classification involves either a suspect class or a fundamental right, courts will analyze the classification with strict scrutiny.

17. **Equal Protection: Words and Phrases.** A suspect class is one that has been saddled with such disabilities or subjected to such a history of purposeful unequal treatment as to command extraordinary protection from the majoritarian political process.

18. **Equal Protection.** When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because

of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

19. **Equal Protection: Proof.** Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.

20. **Equal Protection.** Under the rational basis test, the Equal Protection Clause is satisfied as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

Appeal from the District Court for Madison County: James G. Kube, Judge. Affirmed.

Stephen D. Mossman, Joshua E. Dethlefsen, and Ryan K. McIntosh, of Mattson Ricketts Law Firm, for appellant.

David A. Dudley and Colin A. Mues, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, Cassel, and Stacy, JJ.

Cassel, J.

I. INTRODUCTION

A natural resources district ordered a farmer to stop irrigating Dunaway Farm, because the district's rules prohibited use of ground water for new irrigated acres within the district's management area without a variance. The farmer took the matter to the district court in two ways: an appeal using the Administrative Procedure Act (APA)[1] and a declaratory judgment action challenging the constitutionality of several of the district's rules. The farmer lost on both claims and now

---

[1] Neb. Rev. Stat. § 84-901 et seq. (Reissue 2014).

appeals to this court. On the APA appeal, we find no errors on the record. And because the rules are constitutional, summary judgment denying declaratory relief was correct. We affirm the district court's judgment.

## II. BACKGROUND

Burton P. Lingenfelter farms in Pierce County, Nebraska. He owns and operates Dunaway Farm and three other parcels of land in its immediate vicinity, one of which is called Rehfeld Farm. Dunaway Farm and Rehfeld Farm are located within the jurisdiction of the Lower Elkhorn Natural Resources District (District).

The District's rules contain restrictions on ground water irrigation. Within the district, land may not be irrigated unless it qualifies as a "Historically Irrigated Acre" or it has been granted a variance. Historically Irrigated Acres include those classified as irrigated by the county assessor between 1999 and 2008.

Before 2010, Dunaway Farm was not irrigated or classified as irrigated. Beginning in 2010, Lingenfelter used the well on Rehfeld Farm to irrigate Dunaway Farm. In 2013, the District sent Lingenfelter a letter notifying him that Dunaway Farm did not constitute Historically Irrigated Acres and that it would issue him a cease-and-desist letter if he continued to irrigate it. After a hearing, the District ordered Lingenfelter to cease and desist irrigating Dunaway Farm.

Lingenfelter appealed to the district court, seeking judicial review of the District's decision and filing a declaratory judgment action challenging the constitutionality of several of the District's rules related to irrigation. The district court affirmed the District's decision and sustained the District's motion for summary judgment in the declaratory judgment action. Lingenfelter filed the instant appeal. We moved the case to our docket.[2]

---

[2] Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

### 1. STATUTORY BACKGROUND

This appeal involves challenges to the District's rules and the actions it took pursuant to those rules. We first review the legislation that authorized the District to adopt its rules.

### (a) Natural Resources Districts

In 1969, the Nebraska Legislature created the State's natural resources districts (NRDs).[3] The Legislature has declared that NRDs are political subdivisions of the State,[4] and it has set out 12 "purposes of natural resources districts."[5] The sixth purpose, "development, management, utilization, and conservation of ground water and surface water," is the most relevant in the instant case.[6]

### (b) Nebraska Ground Water Management and Protection Act

In 1975, The Legislature provided NRDs with authority to manage and conserve ground water through the Nebraska Ground Water Management and Protection Act (Act).[7] In the Act's "Declaration of intent and purpose" provision,[8] which has been amended over time, the Legislature emphasized the importance of ground water to the welfare of Nebraskans and the NRDs' role in protecting it. The Legislature stated that "ground water is one of the most valuable natural resources in the state, and that an adequate supply of ground water is

---

[3] Neb. Rev. Stat. § 2-3201 (Reissue 2012).

[4] Neb. Rev. Stat. § 2-3213 (Reissue 2012).

[5] Neb. Rev. Stat. § 2-3229 (Reissue 2012).

[6] *Id.*

[7] Neb. Rev. Stat. §§ 46-701 to 46-756 (Reissue 2010 & Cum. Supp. 2014). See Carl A.P. Fricke & Darryll T. Pederson, *Ground-Water Resource Management in Nebraska*, 17 Ground Water 544 (1979) (brief overview of development of ground water irrigation in Nebraska and Act's original provisions).

[8] § 46-702.

essential to the general welfare of the citizens of this state and to the present and future development of agriculture in the state."[9] It also found that "the management, protection, and conservation of ground water and the reasonable and beneficial use thereof are essential to the economic prosperity and future well-being of the state," and it found that "the public interest demands procedures for the implementation of management practices to conserve and protect ground water supplies and to prevent the contamination or inefficient or improper use thereof."[10]

The Act grants NRDs certain powers "to administer and enforce the [Act] and to effectuate the policy of the state to conserve ground water resources."[11] One section authorizes NRDs to take certain steps in any area within their jurisdiction. Relevant to this appeal, it provides that whether or not any portion of a district has been designated as a "management area," an NRD may:

> (b) Require such reports from ground water users as may be necessary;
>
> (c) Require the reporting of water uses and irrigated acres by landowners and others with control over the water uses and irrigated acres for the purpose of certification by the district;
>
> . . . .
>
> (h) Issue cease and desist orders, following three days' notice to the person affected stating the contemplated action and in general the grounds for the action and following reasonable opportunity to be heard, to enforce any of the provisions of the act or of orders or permits issued pursuant to the act, to initiate suits to enforce the provisions of orders issued pursuant to

---

[9] *Id.*

[10] *Id.*

[11] § 46-707(1).

the act, and to restrain the construction of illegal water wells or the withdrawal or use of water from illegal water wells.[12]

Another provision authorizes NRDs to take additional steps in what were once designated "control areas," "special protection areas," and "management areas," and are now called simply, management areas.

Originally, the Legislature contemplated only the establishment of control areas. In the first version of the Act, the Director of Water Resources, who is now called the Director of Natural Resources (Director), played a large role in establishing control areas. NRDs began the process of designation by requesting that the Director hold a hearing on the matter.[13] After the hearing, the Director could declare an area to be a control area if he or she determined that there was "an inadequate ground water supply to meet present or reasonably foreseeable needs for beneficial use of such water supply."[14]

If a control area was established, the NRD would hold another public hearing to determine which controls to implement within the area.[15] The NRD could choose from a list of authorized controls:

(a) It may determine the permissible total withdrawal of ground water in the designated control area for each day, month, or year, and allocate such withdrawal among the ground water users within the area;

(b) It may adopt and enforce a system of rotation for use of ground water in the control area;

(c) It may adopt well-spacing requirements more restrictive than those found in Chapter 46, article 6; and

---

[12] *Id.*

[13] Neb. Rev. Stat. § 46-658(2) (Reissue 1978).

[14] § 46-658(1).

[15] Neb. Rev. Stat. § 46-664 (Reissue 1978).

(d) It may adopt such other reasonable regulations as are necessary to carry out the intent of [the Act].[16]

The controls chosen by the NRD were subject to the approval of the Director.[17]

In the early 1980's, the Legislature amended the Act and gave NRDs the authority to establish management areas within their jurisdictions. Under these new provisions, establishing a management area began when an NRD prepared a "management plan." Every NRD was required to prepare a management plan that included recommended ground water management objectives and controls and identified a variety of considerations within its jurisdiction, including available ground water supplies, recharge rates, precipitation rates, and crop water needs.[18]

NRDs had to request public comments during their preparations of the plans and submit the plans to the Director for review.[19] But whether or not the Director approved the plan, the NRD could hold a public hearing to propose establishing a management area pursuant to the plan.[20] All interested persons could present testimony at the hearing, and then the NRD decided whether or not a management area should be established.[21] If an NRD established a management area, it was then required to "adopt one or more controls to be utilized within the area in order to achieve the ground water reservoir life goal specified in the plan."[22] The controls authorized were essentially the same as those controls authorized in control areas.[23]

---

[16] Neb. Rev. Stat. § 46-666(1) (Reissue 1978).

[17] *Id.*

[18] Neb. Rev. Stat. § 46-673.01 (Reissue 1984).

[19] Neb. Rev. Stat. §§ 46-673.02 and 46-673.03 (Reissue 1984).

[20] Neb. Rev. Stat. § 46-673.04 (Reissue 1984).

[21] Neb. Rev. Stat. § 46-673.05 (Reissue 1984).

[22] Neb. Rev. Stat. § 46-673.06 (Reissue 1984).

[23] § 46-666 and Neb. Rev. Stat. § 46-673.09 (Reissue 1984).

In 1986, the Legislature amended the Act again, this time protecting ground water quality by authorizing special protection areas within NRDs.[24] The Legislature originally gave the Department of Environmental Control the power to establish these areas.[25] If it did so, then the NRDs within the boundaries of the area were required to prepare action plans "designed to stabilize and reduce the level [of contaminants] and prevent the increase or spread of ground water contamination."[26] The Department of Environmental Control would then approve or deny the plan.[27] The Act authorized NRDs to adopt protective measures within these areas, including requiring educational programs and best management practices.[28]

In 1996, the Legislature undertook a major revision of the Act. For the first time, the Act recognized that ground water and surface water may be hydrologically connected and that hydrologically connected ground water and surface water may need to be managed differently from other water.[29]

The 1996 amendments also combined control areas, management areas, and special protection areas under the single category of management area.[30] NRDs still had the power to establish management areas and adopt controls within those areas, after holding public hearings.[31] And the authority previously given to NRDs in either control areas, special protection areas, or management areas, was consolidated

---

[24] 1986 Neb. Laws, L.B. 894.

[25] Neb. Rev. Stat. § 46-674.07 (Cum. Supp. 1986).

[26] Neb. Rev. Stat. § 46-674.08(1) (Cum. Supp. 1986).

[27] Neb. Rev. Stat. § 46-674.10 (Cum. Supp. 1986).

[28] Neb. Rev. Stat. § 46-674.09 (Cum. Supp. 1986).

[29] Neb. Rev. Stat. § 46-656.05(1) and (2) (Reissue 1998).

[30] See Neb. Rev. Stat. § 46-656.12 (Reissue 1998) ("[i]f a control area, management area, or special ground water quality protection area has been designated in a district prior to July 19, 1996, the area shall be designated a management area . . . .").

[31] Neb. Rev. Stat. §§ 46-656.14, 46-656.19, and 46-656.20 (Reissue 1998).

into one provision.[32] Within management areas, NRDs now had the power to allocate total ground water withdrawal, adopt a system for the rotation of the use of ground water, require well-spacing, require installation of devices for measuring ground water withdrawals, adopt a system requiring the reduction of irrigated acres, require best management practices, require analysis of water and deep soils, require mandatory educational requirements, and require water quality monitoring.[33]

The process for establishing management areas and the consolidated authority granted to NRDs within those areas remain in the Act today. The current version of the Act empowers NRDs to establish management areas to accomplish one or more of the following objectives: "(a) Protection of ground water quantity; (b) protection of ground water quality; or (c) prevention or resolution of conflicts between users of ground water and appropriators of surface water, which ground water and surface water are hydrologically connected."[34]

The Legislature has continued to amend the Act to provide NRDs additional authority within management areas. One relevant addition occurred in 2001, when the Legislature gave NRDs the power to "limit or prevent the expansion of irrigated acres."[35] After further amendments, this provision now provides that an NRD may "limit or prevent the expansion of irrigated acres or otherwise limit or prevent increases in the consumptive use of ground water withdrawals from water wells used for irrigation or other beneficial purposes."[36]

---

[32] Neb. Rev. Stat. § 46-656.25 (Reissue 1998).

[33] *Id.*

[34] § 46-712(1).

[35] 2001 Neb. Laws, L.B. 135.

[36] § 46-739(1)(f).

### 2. DISTRICT'S RULES

Pursuant to its authority under the Act, the District has established a management area that encompasses the entire area of the District, and it has adopted a scheme of rules to manage and conserve ground water within its boundaries. Lingenfelter challenges the District's rule 14. To provide context for our analysis of rule 14, we also explain two of the District's definitions and its rules 13 and 15.

The District's rules separate irrigated land into two categories: Historically Irrigated Acres and "New Groundwater Irrigated Acres." The District defines a Historically Irrigated Acre as

> any acre of land watered for the purposes of agricultural irrigation purposes from a legal well or a Nebraska Department of Natural Resources permitted surface water source that: (1) was classified as irrigated land for any one year between January 1, 1999 and December 31, 2008 by the local County Assessor; or (2) is currently enrolled in a federal, state, or local conservation program and was classified as irrigated land by the local County Assessor within one year prior to being enrolled in such program; and (3) [additional rule not relevant here].

It defines a New Groundwater Irrigated Acre as "any groundwater irrigated acre that does not qualify as a Historically Irrigated Acre," with two exceptions not relevant here. In some of the District's communications with Lingenfelter, it used "New Irrigated Acre," rather than "New Groundwater Irrigated Acre." "New Irrigated Acre" is not defined in the District's rules, and it appears that the District has used the term interchangeably with "New Groundwater Irrigated Acre."

The distinction between Historically Irrigated Acres and New Groundwater Irrigated Acres is essential to the District's rules 13 and 15. Rules 13 and 15 prohibit the creation of any New Groundwater Irrigated Acres anywhere within the District—i.e., they permit irrigation of only Historically Irrigated Acres.

Rule 13 appears to have been adopted in 2009, and it applies to the District's "Hydrologically Connected Area." Rule 13.3 states: "New Groundwater Irrigated Acre Limitation. Effective immediately, there shall be no New Groundwater Irrigated Acres within the Hydrologically Connected Area without a variance. Such activity is strictly prohibited, either from an existing well or a new well, unless approved by the District pursuant to this RULE 13."

Rule 15 applies a similar limitation in the District's "Non-10/50 Area," which the rule defines as the area outside the boundaries of the District's Hydrologically Connected Area. It provides: "New Groundwater Irrigated Acre Limitation. Effective immediately, there shall be no New Groundwater Irrigated Acres within the Non-10/50 Area without a variance. Such activity is strictly prohibited, either from an existing well or a new well, unless approved by the District pursuant to this RULE 15." It is not clear from the provisions of rule 15 when it was adopted.

Rule 14 became effective in 2012 and governs the process of "certify[ing] the number and location of irrigated acres in the District." One of its provisions explains its purpose: "One of the primary goals for the certification of acres is, upon completion of the certification process, to allow irrigation of agricultural lands with ground water only on acres classified as Certified Irrigated Acres within the District."

Rule 14 provides that the District will begin the certification process by "collect[ing] and organiz[ing] data to identify those acres actually irrigated for agricultural purposes within the District, including Historically Irrigated Acres and any other irrigated tract of two acres or more, regardless of the source of water." The District must then use this data "to make a preliminary finding of those acres qualifying as Certified Irrigated Acres." A tract can be certified as irrigated acres if it

(1) has been actually irrigated any one out of ten years from 1999 to 2008, (2) is currently enrolled in a federal,

state, or local conservation program and was classified as irrigated land by the local County Assessor within one year prior to being enrolled in such program, (3) has otherwise been allowed to develop under an approval granted by the Board since 2007, (4) has otherwise been allowed to develop under . . . an approval granted by the Department since 2007, or (5) is irrigated from a lagoon constructed in compliance with a Clean Water Act permit.

After the preliminary finding process is complete, the District's board of directors (Board) must hold one public hearing to receive testimony and evidence on its "proposed final determination." After that hearing, the Board must "certify those acres deemed to qualify as Certified Irrigated Acres within the District." At the time of the cease-and-desist hearing at issue in the instant case (cease-and-desist hearing), final certification in the district had not yet occurred.

With this statutory and regulatory framework in mind, we now review the relevant factual background.

### 3. RELEVANT PARCELS

Lingenfelter owns Dunaway Farm and Rehfeld Farm, and two other parcels nearby. Dunaway Farm, the property subject to the cease-and-desist order at issue, is located in the Hydrologically Connected Area of the District. It has no irrigation well because the land "has very poor formations for wells." Rehfeld Farm is situated immediately diagonally opposite Dunaway Farm. It has a well registered with the Nebraska Department of Natural Resources (Department) to irrigate 125 acres. One of the other two parcels also contains two wells. Lingenfelter and his mother purchased Rehfeld Farm in 2008 for the purpose of using its well to irrigate his three other parcels in the area. He began using the Rehfeld Farm well to irrigate Dunaway Farm in 2010.

In September 2013, the District sent Lingenfelter a letter notifying him that it would order him to cease and desist

irrigating Dunaway Farm because the tract constituted "New Irrigated Acres." The notification letter explained that in 2008, the District imposed a stay on the irrigation of any New Irrigated Acres without a variance and that "a variance was required before developing New Irrigated Acres under either a new or an existing well." It stated that the District's records indicated that Lingenfelter was not granted a variance and that Dunaway Farm did not constitute Historically Irrigated Acres under District rules. Thus, irrigation of Dunaway Farm was prohibited.

The letter informed Lingenfelter that he could request a hearing on the matter before the Board. Lingenfelter requested the cease-and-desist hearing.

The letter also included a copy of the District's rule 14 to "explain the [District's] process for certifying irrigated acres." It did not state that the District was applying rule 14 to Lingenfelter's acres.

### 4. District's Actions

#### (a) Rule 14 Preliminary Finding

After Lingenfelter received the cease-and-desist notification letter, he submitted to the District an application to certify Dunaway Farm under rule 14. He requested that the Board consider certifying Dunaway Farm under rule 14 at his cease-and-desist hearing. Counsel for the District responded and stated that he would forward the certification application to the District. But he clarified that the District was not completing the certification process on a piecemeal basis. He explained that pursuant to rule 14, the District would complete a preliminary determination and later certify the eligible parcels within the entire District.

About 1 week before the cease-and-desist hearing, the District issued Lingenfelter a letter explaining its rule 14 preliminary finding for Dunaway Farm. It stated, in relevant part:

After reviewing information available to us, we have made a preliminary finding that the above referenced parcel of land was not irrigated anytime between 1999 and 2008. This means that no portion of this parcel qualifies as Historically Irrigated Acres as the term is defined under the District's Groundwater Management Rules and Regulations; that this parcel will not be included in the staff recommendation for Certified Irrigated Acres pursuant to Rule 14.4; and that the parcel cannot be irrigated without you first obtaining a variance from the [District].

We considered information from the Pierce County Assessor's Office and our own information of District approved variances to make our preliminary finding of no Historically Irrigated Acres for this land.

### (b) Cease-and-Desist Hearing

Lingenfelter's testimony at the cease-and-desist hearing focused on two main topics: (1) whether Dunaway Farm was irrigated between 1999 and 2008 and (2) his efforts to irrigate Dunaway Farm after 2008.

### (i) Irrigation Between
### 1999 and 2008

Lingenfelter was questioned about whether irrigation occurred on Dunaway Farm between 1999 and 2008 and therefore qualified the land as historically irrigated. When the District's attorney directly asked Lingenfelter whether he irrigated Dunaway Farm in those years, he answered, "Yes." He explained that he used sprinklers with a livestock well and that he used sprinklers when he planted forage crops on the tract. He said, "I did not do an effective job watering at all, but, yes, there was water there." However, when pressed about how much irrigation actually took place, Lingenfelter was vague. He said that he was unsure about how many acres he actually irrigated, and when asked for a rough idea, he

said, "I'm not going there." When asked whether he had any documentation to substantiate the irrigation, he responded that he had witnesses, but that "[t]his [was] not the direction I want[ed] to go."

Later, while being questioned by members of the Board, Lingenfelter admitted that prior to 2010, Dunaway Farm was not irrigated.

### (ii) Irrigation After 2008

Lingenfelter testified that it was his understanding that after purchasing Rehfeld Farm, he could use its well as he pleased. He said that he believed that he had the ability to do so because "there hadn't been any indication that [he] couldn't prior to that." He explained that he "had developed well projects," "piped water," and "used crossroads" in the past.

Lingenfelter described a 2009 meeting with a District staff member where he discussed his plan to use the Rehfeld Farm well to irrigate Dunaway Farm. At this meeting, Lingenfelter and the staff member added up the acres available under the well registrations for the three wells and noted that they totaled 385 acres. Lingenfelter testified that because he planned to irrigate only 285 acres, he "felt that this project was not an issue." He therefore proceeded with his preparations to use Rehfeld Farm well to irrigate the surrounding parcels.

Because Lingenfelter claims that he received preapproval to irrigate Dunaway Farm in this meeting, we set out his testimony below:

A[.] And so when I purchased [Rehfeld Farm], I implemented a plan of I started with Hauptman Construction in preparing the property to run the pipe across and get the property ready to go. So the first thing I did was determine that the well was in good standing and capable, and it was. And in 2009, the spring of 2009 — well, they came out with a moratorium later that year in '08. We had a discussion in December. And I had purchased

some other property. I came to the office here, in that room over there. I was discussing additional property. I felt that I should have the ability to continue on that. And I mentioned this project. The staff member handed me the registrations and did the math. We calculated that there was 385 acres registered under these three wells and my project would not need that many. So at that point in time, I deemed this wasn't an issue. I kept in contact with the staff, looking for a variance for a different property. But because of developing these other properties, I did not have the financial means to apply for the other variance because I didn't think I could get it done and financially get it done in the time. So I was in contact with staff the whole time. I did not know, since I was not filing for a well permit and had plenty of acres, I was not — did not think I had a problem.

So I connected these wells together and I utilized all three wells irrigating [Dunaway Farm].

. . . .

Q[.] So then when you — you said you went to the [District] staff in early 2009, is that right?

A[.] Correct.

Q[.] And who did you meet with?

A[.] I'm not exactly sure so I'm not going to say.

Q[.] And what — with respect to these parcels, what did you discuss?

A[.] I discussed this project that I was doing and I had not — and we looked up the registrations on the three wells, used a calculator, added up the acres that was [sic] available under the registrations and came up to 385. I knew that I was not going to irrigate that many acres of ground, and at that point I felt that this project was not an issue. I had another property I was looking for a well permit and that was the main title of discussion. It was what to do for an extra permit and there were no answers at that time.

Q[.] If you would add the Rehfeld [Farm], [third parcel], [fourth parcel], and Dunaway [Farm] together, how many acres do you come up with?

A[.] Around 285 irrigated.

Q[.] And that includes the 41.89 acres that you're seeking to irrigate in the Dunaway [Farm]?

A[.] Correct.

Q[.] So after receiving those assurances from the [District] staff in early 2009, what did you do after that?

A[.] I proceeded with the dirt work and the preparation for the project.

Lingenfelter eventually completed the project connecting the Rehfeld Farm well to Dunaway Farm in 2010. He testified that he used the tied wells to irrigate Dunaway Farm in 2010 through 2013.

### (c) Cease-and-Desist Order

At the conclusion of the hearing, counsel for the District emphasized that "the sole determination for the Board tonight is in determining whether or not the subject matter property qualifies as [H]istorically [I]rrigated [A]cres. That is all the Board really needs to determine." He also stated that the District has issued cease-and-desist orders in similar circumstances. He said: "There have been, in just the past couple months, I don't know, the last — I should say six to nine months, I believe two to three issues where a cease and desist order was necessary for purposes of individuals irrigating ground that didn't qualify as [H]istorically [I]rrigated [A]cres."

The Board voted nine to one, with two abstaining, to order Lingenfelter to cease and desist irrigating Dunaway Farm. The order noted that Lingenfelter was irrigating Dunaway Farm and explained that the District "prohibits the use of groundwater for new irrigated acres within the [D]istrict's ground water management area without an approved variance from" the District. It did not mention certification of acres or rule 14.

### 5. DISTRICT COURT

### (a) Lingenfelter's Claims

Following the issuance of the cease-and-desist order, Lingenfelter filed a petition in the district court. His petition included two causes of action.

In his first cause of action, Lingenfelter requested judicial review of the District's decision to issue the cease-and-desist order. His petition argued that the issuance of the cease-and-desist order was contrary to the law and facts introduced at the hearing. He apparently made several arguments to support this assertion in his brief to the district court, which is not in our record. Our review of the district court's order reveals that Lingenfelter argued that (1) he received preapproval from District staff to irrigate Dunaway Farm and that the District should be estopped from taking a position contrary to its staff's approval, (2) the District "'misapplied' its own rules in 'determining that [his] land was not considered "irrigated" acres'" under the District's rules, and (3) the provision in rule 14 that allows a tract irrigated between 1999 and 2008 to be certified (look-back provision) is arbitrary and capricious.

In the second cause of action, Lingenfelter requested a declaratory judgment that the District's rule 14 and its rule defining Historically Irrigated Acres violate his due process and equal protection rights under the Nebraska Constitution and that they exceed the District's statutory authority.

### (b) Disposition of Claim
### for Judicial Review

First, the district court rejected Lingenfelter's estoppel claim. It concluded that the evidence was insufficient to conclude that Lingenfelter received preapproval to irrigate from District staff. Rather, Lingenfelter's testimony showed that "he thought that the Dunaway Farm could be irrigated with the other wells based on his own subjective feelings about how this [2009] conversation [with the District staff member] went."

Second, the district court rejected Lingenfelter's claim that the Board "'misapplied' its own rules in 'determining that [his] land was not considered "irrigated" acres.'" The District's rule 2.1.31 defines "Irrigated [A]cre" to mean "any acre that is certified as such pursuant to Rules and Regulations of the District and that is actually capable of being supplied with water through irrigation works, mechanisms, or facilities." Apparently, Lingenfelter argued that (1) the District applied its Irrigated Acres definition to him and (2) because the final rule 14 certification has not taken place, the district court should disregard the first portion of the Irrigated Acre definition and conclude that Dunaway Farm constitutes Irrigated Acres because it is capable of being supplied with water.

The district court concluded that the Board never determined whether Dunaway Farm constituted Irrigated Acres. Rather, the District issued the cease-and-desist order because Dunaway Farm did not constitute Historically Irrigated Acres and because Lingenfelter had not requested a variance. Thus, Lingenfelter's argument could not "be applied to the Board's actual basis for the issuance of the Cease and Desist Order."

Third, the district court rejected Lingenfelter's argument that rule 14's look-back provision is arbitrary and capricious. It first observed that "[t]his argument is convoluted and misplaced." It then concluded that Lingenfelter was not arguing that the 10-year timespan itself was unconstitutional; rather, he was challenging the Board's decision "to promulgate, vote upon, and incorporate Rule 14 into its regulations." The court concluded that the record before it was insufficient "to review the process by which Rule 14 of the [District's] rules and regulations [came] into existence."

Having disposed of all of Lingenfelter's arguments, the district court concluded that the Board's decision to issue the cease-and-desist order was supported by the facts and evidence in the record, and it affirmed the Board's decision in its entirety.

### (c) Disposition of Declaratory
### Judgment Action

In this cause of action, Lingenfelter claimed that his rights to due process and equal protection were violated by rule 14. The parties filed cross-motions for summary judgment, and neither party presented additional evidence outside of the District's record.

Lingenfelter claimed that rule 14's look-back provision, which allows land that was "actually irrigated any one out of ten years from 1999 to 2008" to be certified as irrigated, violates his right to due process. The court disagreed and concluded that "[b]ased on the effects of recent periods of drought on the availability of ground water for irrigation," the look-back provision is not arbitrary and capricious. It did not provide a citation to the record indicating where it found information relating to "the effects of recent periods of drought." The court also rejected Lingenfelter's arguments regarding equal protection. It overruled Lingenfelter's motion for summary judgment and sustained the District's motion for summary judgment.

## III. ASSIGNMENTS OF ERROR

Lingenfelter assigns 11 errors, but he combines several of them for argument in his brief. He claims, restated and consolidated, that the district court erred in (1) finding that the evidence was insufficient to conclude that he received prior approval from District staff to irrigate Dunaway Farm, (2) failing to estop the District from issuing a cease-and-desist order, (3) finding that Dunaway Farm was not irrigated under the District's rules and regulations, (4) finding that the cease-and-desist order did not equate to a determination that Dunaway Farm had no Historically Irrigated Acres, (5) finding that rule 14 does not violate his due process and equal protection rights, (6) finding that the District's decision to issue the cease-and-desist order did not violate his right to equal protection, (7) relying on evidence not in the record,

and (8) misunderstanding his argument that rule 14 is arbitrary and capricious.

## IV. STANDARD OF REVIEW

[1,2] A judgment or final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record.[37] When reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[38] An appellate court, in reviewing a district court's judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings.[39]

[3,4] Whether a decision conforms to law[40] and questions regarding the meaning and interpretation of statutes and regulations[41] are questions of law, which an appellate court independently reviews.

[5-7] The constitutionality of an ordinance passed by a political subdivision[42] and the constitutionality of a statute[43] present questions of law, which an appellate court independently reviews. It follows that the constitutionality of a rule adopted by a natural resources district presents a question of law, which an appellate court independently reviews.

---

[37] *Aline Bae Tanning v. Nebraska Dept. of Rev.*, 293 Neb. 623, ___ N.W.2d ___ (2016).

[38] *Id.*

[39] *Reiter v. Wimes*, 263 Neb. 277, 640 N.W.2d 19 (2002).

[40] *Shaffer v. Nebraska Dept. of Health & Human Servs.*, 289 Neb. 740, 857 N.W.2d 313 (2014).

[41] *Melanie M. v. Winterer*, 290 Neb. 764, 862 N.W.2d 76 (2015).

[42] *Anthony, Inc. v. City of Omaha*, 283 Neb. 868, 813 N.W.2d 467 (2012).

[43] *J.M. v. Hobbs*, 288 Neb. 546, 849 N.W.2d 480 (2014).

## V. ANALYSIS

### 1. Judicial Review of District

#### (a) Estoppel

In this section, we combine Lingenfelter's first two assignments of error. Lingenfelter claims that the district court should have found he received preapproval to irrigate Dunaway Farm and that it should have estopped the District from issuing the cease-and-desist order.

Lingenfelter argues that the district court should have found that he received preapproval to irrigate, because his testimony regarding his conversation with a District staff member was "'uncontroverted'" and because he was entitled to inferences in his favor on summary judgment. To support his "uncontroverted" argument, he cites a statement we made in 1922, in the case of *Morris v. Equitable Life Assurance Society*.[44] We said: "One thing is true, uncontradicted evidence which bears the semblance of truth is entitled to be believed, and courts, as a rule, under these circumstances take this kind of evidence for the truth . . . ."[45]

First, we note that this language taken from *Morris* refers to "evidence which bears the semblance of truth." It is the duty of the trier of fact to weigh the evidence and decide whether it is trustworthy. We have stated that "[e]vidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence."[46] Thus, *Morris* does not reach as far as Lingenfelter argues.

Second, Lingenfelter's reliance on *Morris* is misplaced. The district court did not indicate that it disbelieved Lingenfelter's

---

[44] *Morris v. Equitable Life Assurance Society*, 109 Neb. 348, 191 N.W. 190 (1922).

[45] *Id*. at 351, 191 N.W. at 191.

[46] *Teresi v. Filley*, 146 Neb. 797, 804, 21 N.W.2d 699, 702 (1946).

testimony. Rather, the court found that his testimony was insufficient to establish that he received preapproval to irrigate Dunaway Farm. As the court observed, Lingenfelter testified that he and the staff member used a calculator and added up the acres available under his well registrations. He did not testify that anyone from the District told him that he could irrigate Dunaway Farm. Rather, he stated that after the conversation, he "deemed this wasn't an issue" and he "did not think [he] had a problem."

[8] Lingenfelter argues that his testimony was sufficient and that the district court erred because it "did not give Lingenfelter the benefit of any reasonable inferences" as summary judgment requires.[47] But Lingenfelter is applying the wrong standard to his APA appeal. His petition for judicial review was not before the court on his motion for summary judgment. The motion for summary judgment applied only to his claim for a declaratory judgment. Lingenfelter filed a petition for judicial review pursuant to the APA. Pursuant to the APA, the district court must review the District's order de novo on the record.[48] A district court, in applying a de novo standard of review, can consider and may give weight to the fact that the hearing officer observed the witnesses and accepted one version of the facts rather than another.[49] Thus, on the APA appeal, the district court was not required to give Lingenfelter the benefit of favorable inferences.

[9] Upon our review for errors on the record, we conclude that Lingenfelter's testimony supports the district court's conclusion that Lingenfelter relied upon his own subjective belief regarding the conversation, rather than any statement made by a District staff member. And because the court properly

---

[47] Brief for appellant at 18.

[48] § 84-917(5)(a).

[49] *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. 423, 571 N.W.2d 53 (1997), *disapproved on other grounds, Betterman v. Department of Motor Vehicles*, 237 Neb. 178, 728 N.W.2d 570 (2007).

reached this conclusion, it did not err by declining to address Lingenfelter's estoppel argument. The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to one's detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.[50] Lingenfelter did not rely upon conduct of the District, and he cannot not rely upon equitable estoppel.

### (b) Irrigated Acres

Lingenfelter next contends that "[i]n determining that the Dunaway Farm was not 'Irrigated Acres', the [d]istrict [c]ourt affirmed the Board's misapplication of its Rules."[51] He claims that "the issuance of the Cease and Desist Order to Lingenfelter used the incorrect definition of 'Irrigated Acre' apparently requiring Lingenfelter to actually have had his irrigated acres 'certified'."[52]

First, we note that Lingenfelter mischaracterizes the district court's finding. The district court did not find that "Dunaway Farm was not 'Irrigated Acres.'" Rather, it found that the District "never made a determination that the Dunaway Farm did or did not constitute Irrigated Acres." It concluded that the District issued the cease-and-desist order because Dunaway Farm did not constitute Historically Irrigated Acres and Lingenfelter had not obtained a variance. Based on this finding, the district court concluded that "Lingenfelter's [Irrigated Acres] argument cannot be applied to the Board's actual basis for the issuance of the Cease and Desist Order."

Second, we conclude that the district court's finding is supported by competent evidence. Neither the notification letter nor the ultimate cease-and-desist order states that the District applied the Irrigated Acres definition to Dunaway

---

[50] *Inner Harbour Hospitals v. State*, 251 Neb. 793, 559 N.W.2d 487 (1997).

[51] Brief for appellant at 22.

[52] *Id.* at 24-25.

Farm or even uses the term "Irrigated Acres." Rather, as the
district court found, the notification letter appears to apply the
District's rules relating to New Irrigated Acres, Historically
Irrigated Acres, and variances. Similarly, the ultimate cease-
and-desist order states that the District "prohibits the use of
groundwater for new irrigated acres within the [D]istrict's
ground water management area without an approved variance."
It does not mention "Irrigated Acres."

Thus, because we uphold the district court's finding that
the District did not apply the Irrigated Acres definition to
Dunaway Farm, Lingenfelter's arguments on this point fail.

### (c) Historically Irrigated Acres

Next, Lingenfelter makes another claim regarding the
Irrigated Acres rule. He claims that the district court "erred
in failing to consider [his] argument that the Board misap-
plied the [District's] Rules" regarding Irrigated Acres.[53] He
says that "the Board constructively determined that there were
no 'Irrigated Acres' or 'Historically Irrigated Acres' on the
Dunaway Farm" when it issued the cease-and-desist order.[54]
And he says that the court "specifically noted" that the Board
did not find that Dunaway Farm contained no Historically
Irrigated Acres.[55]

As we explained above, the district court considered and
rejected Lingenfelter's argument that the Board misapplied
the Irrigated Acres rule. The court found that the Board
issued the cease-and-desist order because Dunaway Farm con-
tained no Historically Irrigated Acres. And it found that the
Board never made a determination regarding Irrigated Acres.
These findings were supported by the record. This argument
is meritless.

---

[53] *Id.* at 26.

[54] *Id.*

[55] *Id.*

2. Declaratory Judgment

(a) APA Does Not Apply

At the outset, we note that Lingenfelter purported to file his declaratory judgment petition pursuant to both the APA provision authorizing declaratory judgments[56] and the Uniform Declaratory Judgments Act.[57] We take this opportunity to clarify that the APA does not govern this declaratory judgment action.

The APA provision authorizing declaratory judgment actions applies only if the District is an agency under the APA. The APA provides that "[t]he validity of any rule or regulation may be determined upon a petition for a declaratory judgment thereon addressed to the district court of Lancaster County . . . ."[58] And, with certain exceptions not relevant here, it defines rule or regulation as "any rule, regulation, or standard issued by an *agency*."[59]

[10] NRDs are not agencies for the purposes of the APA. The legislation authorizing the creation of the NRDs provides that they are political subdivisions of the State of Nebraska.[60] Political subdivisions do not fall within the APA's definition of "Agency," which provides that "Agency shall mean each board, commission, department, officer, division, or other administrative office or unit of the state government authorized by law to make rules and regulations," with certain exceptions not relevant to this analysis.[61] In the context of the State Tort Claims Act, we have said that "state agencies are thought of as the alter egos of the state itself, viz., 'departments, agencies,

---

[56] § 84-911.

[57] Neb. Rev. Stat. §§ 25-21,149 to 25-21,164 (Reissue 2008 & Cum. Supp. 2014).

[58] § 84-911(1).

[59] § 84-901(2) (emphasis supplied).

[60] See § 2-3213.

[61] § 84-901(1).

boards, bureaus, and commissions of the State of Nebraska, and corporations whose primary function is to act as, and while acting as, instrumentalities or agencies of the State of Nebraska.'"[62] By contrast, we have stated that a political subdivision is a body which contemplates geographical area and boundaries, public elections, taxing power, and a general purpose or benefit.[63] NRDs are units of local government with defined geographical boundaries, rather than alter egos of the state. As such, they are not agencies under the APA.

Furthermore, although the Act directs that appeals from NRD *orders* are taken pursuant to the APA,[64] it contains no such provision relating to declaratory judgment actions challenging NRD rules. Therefore, the provision in the APA relating to declaratory judgments does not apply.

### (b) Facial Challenge

Lingenfelter claims that the district court erred in granting the District's motion for summary judgment as to his constitutional claims, because "[o]n their face, the [District's] Rules are arbitrary and capricious and the 'look back' provision of Rule 14 violates due process."[65] He also argues that they violate his right to equal protection.

### *(i) Due Process*

Lingenfelter argues that rule 14's look-back provision, which allows acres that have "been actually irrigated any one out of ten years from 1999 to 2008" to be certified, violates his right to substantive due process because it is arbitrary and capricious. We disagree.

---

[62] *Catania v. The University of Nebraska*, 204 Neb. 304, 309, 282 N.W.2d 27, 30 (1979) (quoting Neb. Rev. Stat. § 81-8,210 (Reissue 1976)), *overruled on other grounds, Blitzkie v. State*, 228 Neb. 409, 422 N.W.2d 773 (1988).

[63] *Parriott v. Drainage Dist. No. 6*, 226 Neb. 123, 410 N.W.2d 97 (1987).

[64] See § 46-750.

[65] Brief for appellant at 26.

[11] Lingenfelter raises a substantive due process claim. Under Neb. Const. art. I, § 3, the State cannot deprive any person of life, liberty, or property without due process of law. Substantive due process requires a determination whether a right in which the plaintiff has a legitimate property interest is at issue and, if it is, whether that right was unconstitutionally taken from the plaintiff.[66]

[12] To establish a substantive due process violation, the government's land-use regulation must be clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.[67]

We begin with Lingenfelter's property interest. He claims that he has a legitimate property interest in using the ground water under his property. He also claims that he has a constitutionally protected interest in conducting his occupation, which he says includes "farm[ing] with the modern practice of irrigation so critical to raising a crop."[68] For the purposes of this analysis, we assume that Lingenfelter has a legitimate property interest at issue.

Second, we must determine whether the look-back provision is arbitrary and unreasonable, having no substantial relation to the general welfare. Lingenfelter argues that "[t]here is no clear basis for the 10 year period of 1999-2008. This rule, adopted in 2012, excluded anyone who began irrigation after 2008, but before the adoption of the rule, including Lingenfelter."[69]

Lingenfelter relies on our decision in *Whitehead Oil Co. v. City of Lincoln*.[70] There, a city delayed acting upon a landowner's use permit application until the city could change

---

[66] *Bauers v. City of Lincoln*, 255 Neb. 572, 586 N.W.2d 452 (1998).

[67] *Scofield v. State*, 276 Neb. 215, 753 N.W.2d 345 (2008).

[68] Brief for appellant at 30.

[69] *Id.* at 29.

[70] *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 515 N.W.2d 401 (1994), *disapproved on other grounds, Scofield v. State, supra* note 67.

the zoning designation such as to preclude issuance of the permit. We relied upon the Eighth Circuit's articulation that "'[w]hether government action is arbitrary or capricious within the meaning of the Constitution turns on whether it is so "egregious" and "irrational" that the action exceeds standards of inadvertence and mere errors of law.'"[71] Both Lingenfelter and the District accept this definition, as do we. But we disagree with Lingenfelter's characterization of the look-back provision.

The look-back provision has a substantial relation to the general welfare. Regarding the general welfare, the Legislature stated in the Act that "an adequate supply of ground water is essential to the general welfare of the citizens of this state and to the present and future development of agriculture in the state."[72] It also found that "the management, protection, and conservation of ground water and the reasonable and beneficial use thereof are essential to the economic prosperity and future well-being of the state."[73]

The look-back provision allows the District to ensure that there is an adequate supply of ground water. It establishes a baseline number of acres historically irrigated within the District, which is necessary in order to limit the expansion of irrigated acres and ensure an adequate supply of ground water. And the Act authorizes this limitation. It provides that within a management area, an NRD may "limit or prevent the expansion of irrigated acres or otherwise limit or prevent increases in the consumptive use of ground water withdrawals from water wells used for irrigation or other beneficial purposes."[74]

And when evaluated in the context of the District's other rules, the look-back provision's 1999-to-2008 window is not

[71] *Id.* at 693, 515 N.W.2d at 410 (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215 (8th Cir. 1990)).

[72] § 46-702.

[73] *Id.*

[74] § 46-739(1)(f).

arbitrary. It appears reasonable for the window to end in 2008, because after 2008, there were limitations in place on New Groundwater Irrigated Acres in the District. The District's cease-and-desist notification letter stated that the District imposed a stay on New Irrigated Acres in 2008. Lingenfelter appeared to allude to this 2008 stay in his testimony regarding his 2009 meeting with a District employee. He said, "[W]ell, they came out with a moratorium later that year in '08." Although we have not found any other information in the record regarding that 2008 stay, the record does reflect other limitations. The District's rule 13, which forbids New Groundwater Irrigated Acres in the Hydrologically Connected Area without a variance, appears to have been adopted in 2009. And rule 15 also prohibits New Groundwater Irrigated Acres, although we cannot determine when that rule was adopted.

Furthermore, rule 14 does not necessarily exclude those who began irrigating after 2008. It allows certification of acres that were developed after 2007, pursuant to approval granted by either the Board or the Department. It appears that the "approval" referenced in this provision refers to a variance or some other form of permission to irrigate. Therefore, rule 14 excludes only those who did so without permission, in violation of limitations apparently already in place.

We cannot say that the look-back provision is so egregious and irrational that it exceeds standards of inadvertence and mere errors of law. To the contrary, it appears to be a reasonable means of conserving ground water, a resource essential to the general welfare. Because the look-back provision is not arbitrary or capricious in the constitutional sense, the district court did not err in rejecting Lingenfelter's due process challenge.

### (ii) Equal Protection

Lingenfelter claims that the look-back provision violates his right to equal protection because it divides landowners

"into winners and losers based upon an arbitrary calendar date."[75] He concedes that he is not "'entitled to unlimited and unfettered use'" of his wells.[76] Rather, he argues that "[t]his is a suspect classification not rationally related to a legitimate governmental purpose."[77]

[13-15] The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges.[78] The Equal Protection Clause requires the government to treat similarly situated people alike.[79] It does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.[80]

[16-18] If a legislative classification involves either a suspect class or a fundamental right, courts will analyze the classification with strict scrutiny.[81] A suspect class is one that has been saddled with such disabilities or subjected to such a history of purposeful unequal treatment as to command extraordinary protection from the majoritarian political process.[82] Lingenfelter complains of a suspect *classification*, but he does not contend that he is a member of a suspect class. When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.[83]

---

[75] Brief for appellant at 30.

[76] *Id.*

[77] *Id.*

[78] *Citizens for Eq. Ed. v. Lyons-Decatur Sch. Dist.*, 274 Neb. 278, 739 N.W.2d 742 (2007).

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id*.

[83] *Id.*

[19,20] Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.[84] Under this most relaxed and tolerant form of judicial scrutiny of equal protection claims, the Equal Protection Clause is satisfied as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.[85]

Here, the class of irrigators who began irrigating after 2008 is not a suspect class. There is no evidence that the class of irrigators has been saddled with disabilities or otherwise subjected to a history of purposeful unequal treatment. Therefore, the rational basis applies. And Lingenfelter concedes as much, arguing that the classification of the look-back provision is "the essence of an action not rationally related to a governmental interest."[86]

The rational basis test is satisfied here. Applying the three-part analysis set out above, we first consider the policy reason for the classification. It appears that the policy reason for the look-back provision is to establish a baseline of acres historically irrigated within the District, in order to conserve ground water. Conserving ground water is a plausible policy reason for the classification.

Next, we consider whether the legislative facts on which the classification is based may rationally have been considered to be true. Because the record does not contain information

---

[84] *Id.*

[85] *Staley v. City of Omaha*, 271 Neb. 543, 713 N.W.2d 457 (2006).

[86] Brief for appellant at 30-31.

regarding the adoption of the look-back provision, we cannot recite the specific legislative facts relied upon by the District. But it seems clear the underlying legislative fact is that there is a need to conserve ground water to ensure an adequate supply. The District could have rationally considered this to be true when it adopted the look-back provision.

Finally, we must consider whether the relationship of the classification to its goal is so attenuated as to render the distinction arbitrary or irrational. It is not. In order to conserve ground water, the District needed to establish a baseline number of acres irrigated. The look-back provision is rationally related to the goal of conserving ground water. Thus, the district court correctly determined that rule 14's look-back provision does not violate Lingenfelter's right to equal protection.

### (c) As-Applied Challenge

In this section, Lingenfelter claims that the District's decision to issue the cease-and-desist order was unconstitutional. He argues that he did not receive equal protection of the law, "because he was issued the Cease and Desist Order because the Dunaway [F]arm did not contain 'certified' acres or '[H]istorically [I]rrigated [A]cres' when meanwhile, the certification process had not even begun and there were not <u>any</u> acres that had been 'certified' in the entire district."[87] He also argues that the District's "self-perceived authority to make whatever rules they so choose is fundamentally unfair."[88]

We first address Lingenfelter's equal protection claim. To the extent that it rests on his claim that the District issued the cease-and-desist order because he had not yet certified his acres, it fails. We have already determined that the district court correctly concluded that the District issued the order because Dunaway Farm did not constitute Historically Irrigated Acres and Lingenfelter had not obtained a variance.

---

[87] *Id.* at 34.

[88] *Id.*

And to the extent it rests on the fact that the District issued the order because Dunaway Farm did not contain Historically Irrigated Acres, it fails to state a claim. The Equal Protection Clause requires the government to treat similarly situated people alike. Lingenfelter does not allege that he was treated differently from any other person or class of persons with New Groundwater Irrigated Acres. And at the hearing, counsel for the District testified that the District has issued cease-and-desist orders two or three times in similar circumstances. Without such an allegation, Lingenfelter's equal protection argument fails.

Lingenfelter's claim that the District lacked authority to adopt its rules limiting the expansion of irrigated acres also clearly fails. The Act authorizes NRDs to establish management areas within their jurisdictions. The District established one that covers the entire area of the District, a decision Lingenfelter does not challenge. And the Act requires districts to take specific steps to conserve ground water within management areas—§ 46-739(1) says that the NRD "shall by order adopt one or more" of the authorized controls. One of the authorized controls provides that a district "may limit or prevent the expansion of irrigated acres or otherwise limit or prevent increases in the consumptive use of ground water withdrawals from water wells used for irrigation or other beneficial purposes."[89] Clearly, the District had the authority to prevent Lingenfelter from expanding irrigated acres on Dunaway Farm.

### (d) Evidence Not in Record

Next, Lingenfelter complains that the district court relied upon evidence not in the record when it determined that the look-back provision is constitutional. He points to one sentence from the district court's order, where it stated: "Based on the effects of recent periods of drought on the availability

---

[89] § 46-739(1)(f).

of ground water for irrigation, the Court concludes that using a ten-year 'look back' period is not arbitrary and capricious." Lingenfelter argues that "there is simply no evidence from the public hearing regarding either: (1) recent periods of drought or (2) impact of drought on the availability of groundwater for irrigation in the [District]."[90] He argues that we should reverse the district court because of this "harmful error."[91]

First, we note that although we have not found any explicit discussion about recent periods of drought in the record from the hearing, it does contain ample references to the limited availability of ground water in Nebraska. For instance, the record contains a document labeled "Staff recommendations" from the "Information, Planning and Programs Subcommittee" which recommends that the Board "[a]llow no new groundwater irrigated acres" in 2014 because of concerns about overpumping and its "cumulative effect on groundwater declines." That document also states: "The problems we experienced last year are likely more widespread than our information shows. We received calls from domestic well owners with well interference problems, but irrigators and well drillers have indicated to us that more areas experienced groundwater declines than were reported to the District." And the District's rules 13 and 15 prohibit the creation of any New Groundwater Irrigated Acres without a variance. The clear tenor of these rules is that there is a serious need to conserve water within the District because ground water is declining. We also note that the Act itself specifically references "the impact of extended drought on areas of the state" in its "Declaration of intent and purpose" provision.[92]

Second, assuming, without deciding, that the district court erred by referencing periods of drought not explicitly discussed

---

[90] Brief for appellant at 33.

[91] *Id.*

[92] § 46-702.

in the record, the error was harmless. We review constitutional questions de novo on the record, and we have independently concluded that the look-back provision is constitutional. Error that does not prejudice the party does not provide grounds for relief on appeal.[93] There is no reversible error here.

### (e) Adoption of Rule 14

Finally, Lingenfelter points out that he challenges the look-back provision itself, not the process by which it was adopted, and he complains that "the District Court misunderstood this argument as being aimed at 'the [District's] actual adoption of Rule 14.'"[94] He argues that "the District Court erred in finding that there was no record to challenge the adoption of Rule 14, and must be reversed on this point."[95]

There are no grounds for reversal here. Even if the district court did misunderstand Lingenfelter's argument, it went on to address his constitutional challenges to rule 14. Lingenfelter does not explain how this supposed error prejudiced him. This argument fails.

### VI. CONCLUSION

We find no errors on the record in the district court's judicial review of the District's order. And the district court did not err in granting the District's motion for summary judgment as to Lingenfelter's request for a declaratory judgment. Accordingly, we affirm the decision of the district court.

AFFIRMED.

---

[93] *Huber v. Rohrig*, 280 Neb. 868, 791 N.W.2d 590 (2010).

[94] Brief for appellant at 36.

[95] *Id.*