R. Pierce CHATHAM, Plaintiff-Appellee,

v.

Maynard JACKSON, Pelham C. Williams, William T. Bush, W. Curtis Hester and Wendell R. Campbell, Defendants-Appellants.

No. 78–1114.

United States Court of Appeals, Fifth Circuit.

March 6, 1980.

---

Ferrin Y. Mathews, J. M. Harris, Jr., Atlanta, Ga., for defendants-appellants.

Robert Strickland, Jr., Atlanta, Ga., for plaintiff-appellee.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

GEE, Circuit Judge:

In *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974), this court held unconstitutional the City of Atlanta's practice of refusing water service to a tenant when the landlord's bill was in arrears. The case now before us requires us to decide whether the city may terminate water service to a landlord when the tenant's bills are delinquent. The trial court stated that "*Davis* operates to protect all parties, tenant and property owner alike, from the city's use of its power to withhold water and sewer services to coerce applicants for such services to pay water bills for which they are not liable." Because we find the case of a landlord distinguishable from that of a tenant, partly on the basis of a recent decision by the Georgia Supreme Court, we must reverse the trial court.

The facts are not in dispute. Plaintiff is the owner of a 264-unit apartment building in Atlanta, known as the Whitehouse on Peachtree. The City of Atlanta supplies water to the entire building through a single water meter. Plaintiff leased the building in October 1970 to Georgian White House Operating Company ("Georgian"). Georgian in turn assigned its leasehold interest in October 1976 to White House Towers, Inc. ("White House"). The transfer and assignment of leasehold interests were arms-length transactions. No relationship existed between plaintiff and White House other than landlord and tenant. White House took possession and opened an account with the city, in its own name, for water and sewer services. The defendants collected no security deposit from White House, and the city did not and does not regularly collect deposits on accounts of the type in question. White House timely paid its bills for water and sewer services supplied during October and November 1976. A bill for $3,043.02 was sent to White House on January 8, 1977, based on a regularly scheduled meter reading reflecting service provided from November 28 to December 28, 1976. This bill was never paid.

Meanwhile, Georgian had filed a complaint in state court seeking the appointment of a receiver to take custody and control of the apartment building. The court appointed a receiver on December 29, 1976, who took and retained possession until January 12, 1977, when, upon intervention and motion of the plaintiff in the receivership proceeding, plaintiff was restored to possession of the property.

A bill in the amount of $2,205.72 for service between December 28, 1976, and January 28, 1977, based on a meter reading on the latter day, was sent out in early February 1977. Sometime after February 1, 1977, plaintiff opened an account for water and sewer service in his own name. Following some discussion between plaintiff's representatives and representatives of the city, the plaintiff agreed to pay, and paid, a pro rata share of the January bill that represented services supplied to the apartment house from January 12, to January 28, 1977, calculated at $1,102.86. Following the payment period ending January 28, 1977, all subsequent bills for water and sewer service to the apartment house have been paid by plaintiff on a current basis.

However, this result left the city with two unpaid water and sewer bills, one for the entire month of December and one for part of the month of January. These bills totaled $4,146.78. The City of Atlanta's attorney informed plaintiff that the city expected plaintiff, as owner of the property in question, to pay this past-due amount.[1] Plaintiff contested his liability for the bills. Following more discussion, the city threatened to terminate water service to the apartment house.

Plaintiff filed this action on May 19, 1977, seeking temporary and permanent injunctive relief. On the same day a temporary restraining order was entered enjoining the defendants from terminating services to the premises. At the hearing on the preliminary injunction the parties agreed to continue the temporary restraining order in

---

1. Defendants have taken no steps, other than sending standard form billings, to collect the unpaid bill from White House.

effect in the form of preliminary injunctive relief until the issues could be resolved on the merits.

On October 25, 1977, the district court entered its final order enjoining the defendants from terminating water service to the apartment house. It declared that defendants' application of the city's ordinance to the plaintiff in this case resulted in an unconstitutional deprivation of due process and equal protection of the laws under the fourteenth amendment.

## I.

█ This case essentially involves the question of where the City of Atlanta may constitutionally place the risk of nonpayment of its water bills. We have already held that the city may not place the risk of nonpayment of a landlord's bills on the tenant. *See Davis v. Weir, supra.* Because of an intervening state court decision and because we find constitutional and policy considerations different when risk of nonpayment is placed on the landlord, we must reverse the trial court.

The trial court found that the City of Atlanta lacked authority to impose personal liability on a property owner for the contractual liabilities incurred by a lessee. Additionally, the trial court evidently found no proof that the City of Atlanta intended to impose a lien on the premises in question for unpaid bills. Since the property owner here never expressly agreed to be responsible for the payment of water bills of its tenants, plaintiff's liability necessarily had to be based on either a lien or implied-consent theory. Failing to find either theory supported by state law, the trial court held the city's practice of terminating water service unconstitutional.

However, two developments occurred in 1978 that shed a different light on the case

at bar. First, the Georgia Supreme Court, in *Bowery Savings Bank v. DeKalb County,* 240 Ga. 528, 242 S.E.2d 50 (1978), held that DeKalb County had a valid lien on rental property, enforceable against the property owner, for unpaid water bills of a tenant. The DeKalb County ordinance is almost identical to the city ordinance at issue here. Both allow refusal of service where there are delinquent accounts.[2] The Georgia court examined earlier Georgia cases[3] and adhered to them, concluding:

> These cases are modified by *Davis v. Weir, supra,* to the extent that non delinquent tenants must constitutionally be provided with . . . services as individuals upon proper application and payment for installation of meters. However, the basic ruling of our cases that the delinquent service charges are liens against the property which authorize the discontinuance of such services to the owner ⸋of the property remains unchanged.

242 S.E.2d at 52. Thus, the Georgia court found that liens arising because of delinquent accounts of a prior owner could be enforced against the present owner by refusal of service.[4]

The other case relevant to this discussion is *Union Circulation Co. v. Russell,* 463 F.Supp. 884 (N.D.Ga.1978), decided by the same trial judge who heard this case, to which he referred:

> [A]bsent either judicial or statutory authority expressly imposing liability on a property owner for unpaid water bills on his property, by means of a lien or otherwise, the *Chatham* court held that the due process and equal protection clauses of the fourteenth amendment protect "all parties, tenant and property owner alike from the [defendant's] use of its power to withhold water and sewer services to coerce applicants for such services to pay water bills *for which they are not liable.*"

2. *See* discussion *infra* at pp. 76–78.

3. *Harrison v. Jones,* 226 Ga. 344, 175 S.E.2d 26 (1970); *Dodd v. City of Atlanta,* 154 Ga. 33, 113 S.E. 166 (1922); *City of Atlanta v. Burton,* 90 Ga. 486, 16 S.E. 214 (1892).

4. We note that *Bowery Savings* finds constitutional the enforcement of a lien for unpaid water bills against a *subsequent* owner; that is, one who did not own the property at the time the bills accrued. We intimate no views at this time as to whether we would agree, since that case is not before us.

*Id.* at 886 (footnote omitted) (emphasis in original). The court considered *Bowery Savings* and held: "[I]f there are valid liens on a property for unpaid water bills, then it is not unconstitutional for DeKalb County to refuse services to the owner of any property subject to such liens." *Id.* However, the court distinguished the case under consideration here by stating:

> Unlike *Chatham*, however, the defendants in the case *sub judice* have cited to authority expressly creating liens on any property in DeKalb County at which there remains an unpaid water bill.[4]
>
> [4] In *Chatham* the defendants failed to cite to any authority expressly creating a lien on any property in the City of Atlanta at which there remains an unpaid water bill.

*Id.* at 886 & n. 4. The defendants here, however, *did* bring to the trial court's attention the new City Charter and the ordinance allowing termination of service, discussed below.

We believe that *Bowery Savings* controls this case and that the county ordinance at issue in *Union Circulation* is simply not distinguishable from the city ordinance at issue here. The authority to impose a lien in DeKalb County arises from a statute and an ordinance. The statute states:

> The Commissioner is hereby authorized to provide by regulation and rules for the assessment and collection of a reasonable tax or charge for the maintenance of said sewer line and for the disposal of sewage. Said assessment may be made on the basis of gallonage of water metered to the property served by said sewer or by fixing a flat charge for each service connection, such payments to be made either on a monthly or an annual basis as provided for in the rules and regulations to be adopted. . . . *Any taxes or charges as herein provided shall become a lien on the property served by said sewer line.* (emphasis added).

1949 Ga.Laws pp. 1590, 1593–94 (as quoted in *Union Circulation*, 463 F.Supp. at 887). The DeKalb County Code of Ordinances § 6–2002 reads in pertinent part:

> Where there remains a delinquent water bill at any meter service after the occupant of the premises thereof has been notified by the inclusion of the amount of the past due bill in a current water bill or a separate bill and given an opportunity to pay the bill and refuses to promptly pay it, water service to this meter service shall be discontinued regardless of whether the bill remaining delinquent was incurred by a prior owner or occupant of the premises, and the county shall not again supply water to this building, place or premises until this arrears shall be fully paid.

*Quoted in Union Circulation*, 463 F.Supp. at 885 n. 1.

The statute and ordinance in question here are quite similar. The Georgia General Assembly enacted a new charter for the City of Atlanta in 1973. It authorizes the city to operate a water works and sewage disposal system and "to fix the taxes, charges, rates, fares, fees, assessments, regulations and *liens*, penalties *and withdrawal of service for refusal or failure to pay same* and the manner in which such remedies shall be enforced . . . ." Charter of the City of Atlanta, Appendix 1, (9), 1973 Ga.Laws pp. 2188, 2254 (emphasis added). Pursuant to this grant of authority, the city passed an ordinance that states: "Upon the failure of any person to pay any water bill, assessment, advance payment or charge against any premises for which they are responsible . . . , the Commissioner is authorized to turn off and discontinue water service to the person and/or premises until the bill or charge is paid . . . ." City of Atlanta Code of Ordinances § 9–4072.

We might be more hesitant to equate the DeKalb County laws with the Atlanta provisions were it not for the language of the Georgia Supreme Court in *Bowery Savings*. That decision paints with a broad brush and makes no distinction between the DeKalb ordinance at issue there and cases involving the City of Atlanta.[5] Thus, we hold that

---

5. *See* n. 3, *supra*. These cases concerned previous versions of the ordinance that no less clearly allowed termination of service.

the ordinances and statutes involved in this case and in *Bowery Savings* are similar enough to require us to find the presence of a lien here.

This element alone makes this case distinguishable from *Davis v. Weir*, in which we found no lien on the tenant's rented premises.

> Although the defendants assert that the power to discontinue service for nonpayment, which is authorized by . . . the City Charter, . . . is a "specie of a lien," neither that language nor any other state law or local ordinance cited by the defendants *expressly* creates a lien for unpaid water bills. The Water Works concedes that it has never foreclosed on such a lien and that no recordation devices exist to place such an encumbrance on the record. The lien theory apparently had its genesis in *City of Atlanta v. Burton*, 90 Ga. 486, 489–490, 16 S.E. 214 (1892), which reasoned that water was furnished to premises and not to people wherefore a charge "somewhat analogous" to a lien for taxes could be imposed on the land and collected from the present occupant as a condition of further service.

497 F.2d at 145 n. 9 (emphasis in original). We further held that, even if a lien existed, it gave no authority for refusing service to the *tenant*, who should be allowed to initiate direct water service without paying the landlord's overdue bill. *Id.* at 145 & n. 10. *Davis* thus has limited applicability to the case at bar.

## II.

 The *Davis* court held that the city's practice offended both equal protection and due process and quoted from a district court opinion in the case:

> "The fact that a *third-party* may be financially responsible for water service provided under a prior contract is an irrational, unreasonable and quite irrelevant basis upon which to distinguish between otherwise eligible applicants for water service."

497 F.2d at 145 (quoting *Davis v. Weir*, 359 F.Supp. 1023, 1027 (N.D.Ga.1973) (emphasis in original)). Since we find no fundamental right [6] involved here, the city's practices at issue offend substantive due process [7] only if they constitute arbitrary spoliation of property. *Missouri Pacific Railway v. Humes*, 115 U.S. 512, 519, 6 S.Ct. 110, 112, 29 L.Ed. 463 (1885). The courts do not sit as super legislatures, and lawmaking bodies are usually presumed to have good and valid reasons for their regulations. *See, e. g., Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *cf. United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938) (closer scrutiny may be necessary to protect political minorities). We can imagine many valid reasons for the city's practice, and we do not find it arbitrary to coerce an owner into paying for services that benefitted his property.

 If we construe plaintiff's due process complaint here to be grounded on a "taking" theory, that is, the constitutional prohibition against governmental confiscations [8] without just compensation, the city's practice must meet a two-pronged test. First, the public's interest must require the regulation. Second, the means must be reasonably necessary to accomplish the goal and not "unduly oppressive" to individuals. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 595, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). *See also Penn Central Transportation Co. v. New York*, 438 U.S. 104, 98 S.Ct.

---

**6.** *See* discussion of this point *infra* at p. 79. Of course, when a fundamental right is affected, regulations may be justified only if *necessary* to accomplish a *compelling* state interest. *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973).

**7.** Plaintiff does not contest sufficiency of notice, nor does he complain of any other infirmity commonly said to violate *procedural* due

process. Therefore, we understand his appeal to embrace only the substance of the laws.

**8.** Restrictions on use that would occur when water service is refused may constitute a "taking" for which compensation is required. *See Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928).

2646, 57 L.Ed.2d 631 (1978). We find both parts satisfied here. The city's financial soundness depends in part on its ability efficiently to collect what is owed it for utilities furnished. The city could reasonably choose refusal or termination of service to the owner over other collection methods, such as litigation against tenants, who might no longer be within the reach of the courts. Plaintiff claims no undue oppression; for example, he does not argue that he must sell the property for want of resources from which to pay the overdue bills. Nor does he claim that he cannot recover the amount paid by legal action against the tenant or by increasing the rent.

We therefore find no offense to due process committed here.

In *Davis* the tenants also complained that the city had denied them equal protection of the laws under the fourteenth amendment by establishing arbitrary classifications:

> Their complaint is that the Water Works has divided those who *apply* for its services into two categories: applicants whose contemplated service address is encumbered with a pre-existing debt *(for which they are not liable)* and applicants whose residence lacks the stigma of such charges. Although there is nothing in these definitions, standing alone, to distinguish either group as a better or worse risk, the Department only furnishes its services to the latter class.

497 F.2d at 144 (emphasis added). We found that such classifications offended the equal protection clause.

> A collection scheme . . . that divorces itself entirely from the reality of *legal accountability* for the debt involved, is devoid of logical relation to the collection of unpaid water bills from the defaulting debtor. The city has no valid governmental interest in securing revenue from innocent applicants who are forced to honor the obligations of another or face constructive eviction from their homes for lack of an essential to existence—water.

*Id.* at 144–45 (footnotes omitted and emphasis added).

■ The most lenient test under the fourteenth amendment requires that classifications such as these be reasonable, not arbitrary, and rationally and fairly related to a valid governmental objective; all persons similarly circumstanced should be treated alike. *See id.; Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). The Constitution permits states a wide scope of discretion in making classifications, *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), unless the classification is based on some more closely scrutinized criterion, such as race or sex, or unless the classification affects a fundamental right or interest. *See Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (sex); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel interstate); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race). *See generally* Gunther, *The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L. Rev. 1 (1972).

Since in *Davis* we found the City of Atlanta's procedures invalid under the traditional "rational relationship" test, we had "no need to decide whether the Constitution accords citizens a fundamental right to municipal water service." *Davis v. Weir*, 497 F.2d at 144. Neither party submitted briefs to us arguing for or against a higher level of scrutiny than we applied in *Davis*. However, *Davis* characterized the city's policy as accomplishing "constructive eviction from [tenants'] homes for lack of an essential to existence—water," 497 F.2d at 145, and quoted approvingly from the district court opinion in *Davis* that characterized water as an "absolute necessity of life." *Id.* at n. 8. Although we do not decide this question, *Davis* may implicitly mandate a higher level of scrutiny than the rational relationship standard.

■ Because "the importance of a service performed by the State does not determine whether it must be regarded as fundamental" for equal protection purposes, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973), and because even the right to housing, *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and to welfare benefits, *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), while as crucial to existence as water service, are not so fundamental as to require the closest constitutional scrutiny, *San Antonio Independent School District v. Rodriguez, supra*, 411 U.S. at 32–33, 93 S.Ct. at 1296, we will not utilize here the strict test reserved for fundamental rights. A more satisfactory alternative is an intermediate standard, articulated in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); that is, classifications such as the one at issue here are valid if they "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Id.* at 197, 97 S.Ct. at 457.

■ No one questions the importance of the city's objective: to remain financially sound through the collection of sums owed it for water and sewer services. Thus, we must decide whether the collection scheme devised by the city is substantially related to the achievement of that objective. The scheme, when applied to tenants, was found wanting in *Davis*. A property owner's situation, however, is distinguishable from the tenant in *Davis*. A new tenant receives no benefit from services furnished to a prior occupant; thus *Davis* held it unreasonable to require tenants to pay the past due bills of others before initiating or continuing service. On the other hand, an owner's property is benefitted by the utility services, and it is eminently reasonable for the city to impose a lien and threaten to terminate service to the benefitted property when the service is not paid for.

The city's practice seems to be closely related to its objective of dispensing benefits to property only upon payment of proper compensation. The *property*, as we have seen, is impressed with a lien for unpaid water bills. While the owner may not be personally liable, the lien on the premises is enforceable through, among other things, refusal of service. Service is terminated only to the address at which the bills accrued, not to all property owned by the same landlord. The landlord's tenants will be protected by *Davis'* requirement, 497 F.2d at 145, that the city give notice to all individual tenants of any imminent termination of services and opportunity to contract for continued water and sewer services on an individual basis. The city's procedure seems certain to effect eventual payment of water bills. It encourages property owners either to rent to responsible tenants or to collect security in advance; also, property owners will be less wasteful of a natural resource and more careful about the condition of the plumbing in their rental property if they are held ultimately responsible for huge bills caused by a large leak.[9] If all else fails,[10] we presume that the city can still assert its lien and collect the arrears when the property is sold. Therefore, we find that the imposition of a lien, and the resulting right to terminate water and sewer services to the owner of property until charges accruing during his ownership are paid, constitute a collection scheme that bears a substantial relation to the city's important and valid objectives. The scheme thus passes muster even under a stricter standard than that applied in *Davis*.

Policy considerations also point to this result. The city in *Davis* sought to collect a landlord's bills from the tenant, although the latter probably was in a weak bargaining position. Tenants generally have few

**9.** Defective plumbing precipitated the lawsuit in *Davis*. *See* 497 F.2d at 141.

**10.** For example, if the defaulting tenant is beyond reach of legal process, and the landlord refuses to pay overdue bills, and a new tenant initiates service in his or her own name, the city may have no immediate, direct recourse. We have been cited to no Atlanta provision allowing foreclosure and sale on nonsatisfaction of the charges.

self-help remedies against their landlords, but the obverse is not usually true. The landlord commonly draws up the lease and can provide in it for the eventuality of the tenant's nonpayment of utility bills by collecting a deposit or through other security clauses. The lease can give the owner the right to evict for nonpayment of utility bills. If a multi-unit building is involved, we assume that the property owner initially dictates whether the premises will be served through a single meter or through separate meters and thus exercises substantial control over the amount of potential lien liability from each meter. Practically speaking, the owner's control over the quality of the plumbing and the frequency of maintenance also indicate that he or she should bear the risk of leaks and large bills.

The *Davis* opinion suggests indirectly another policy reason for our result here. The court intimated that the city could constitutionally require security deposits from all who use water services. *Id.* at 144–45. However, the city might prefer to use the method under attack here rather than impose a standard security deposit on all renters, regardless of their ability to pay or their credit rating. Such security deposits could be a regressive measure in the case of people on low, fixed incomes who possess few capital resources. Real property owners, on the other hand, by definition have assets from which they can receive income and on which a lien may be imposed. The city's scheme here is at least as valid as the security deposits suggested in *Davis* and perhaps less onerous to low-income renters.

We find precedential support for this outcome. The Supreme Court upheld the imposition and enforcement of liens against the property of the landlord for the unpaid water bills of her tenant in *Dunbar v. City of New York*, 251 U.S. 516 (1920), and found no violation of due process, although the city sought to foreclose the lien rather than merely to terminate service to the property. As we have discussed earlier, the district court in *Union Circulation, supra*, recently found a similar county scheme constitutional.

Cases following *Davis v. Weir, supra*, do not dictate a contrary result. All involve either termination or initial refusal of service to *tenants* based on overdue bills of owners or prior occupants and not the situation presented to us. *See Sterling v. Village of Maywood*, 579 F.2d 1350 (7th Cir. 1978); *Craft v. Memphis Light, Gas & Water Division*, 534 F.2d 684 (6th Cir. 1976), *aff'd on procedural due process grounds*, 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1978); *Koger v. Guarino*, 412 F.Supp. 1375 (E.D.Pa.1976).

In light of the foregoing, we reverse the judgment of the court below and find constitutional the City of Atlanta's policy of terminating water services to a property owner whose tenant has become delinquent in paying its water bill.

REVERSED.