Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/30/2020 08:08 AM CDT

REO Enterprises, LLC, a Nebraska limited
liability company, appellee, v. Village of
Dorchester, a Nebraska political
subdivision, appellant, and
Ange Lara, appellee.

___ N.W.2d ___

Filed August 7, 2020.    No. S-18-970.

1. **Ordinances.** Interpretation of a municipal ordinance is a question of law.
2. **Constitutional Law: Ordinances.** The constitutionality of an ordinance presents a question of law.
3. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
4. **Equal Protection.** Equal protection requires the government to treat similarly situated people alike.
5. ____. Equal protection does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.
6. ____. When a classification created by governmental action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, equal protection requires only that the classification rationally further a legitimate state interest.
7. **Constitutional Law: Ordinances: Presumptions.** Courts begin with a presumption of validity when passing upon the constitutionality of an ordinance.
8. **Equal Protection: Proof.** Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.
9. **Equal Protection.** The rational basis test, which is the most relaxed and tolerant form of judicial scrutiny of equal protection claims, is satisfied

as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decision-maker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

10. **Equal Protection: Records.** In equal protection claims, where the record does not contain information regarding the adoption of an ordinance, statute, or other governmental action, courts analyze the underlying legislative facts the governmental entity alleged to have considered when such basis is clearly apparent.

11. **Equal Protection: Ordinances: Proof.** The burden is upon a party challenging an ordinance under an equal protection claim to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.

12. **Equal Protection: Legislature: Intent.** Social and economic measures violate equal protection only when the varying treatment of different groups or persons is so unrelated to the achievement of any legitimate purposes that a court can only conclude that the Legislature's actions were irrational.

13. **Equal Protection.** The rational basis test does not require a governmental entity to choose a specific course of action to address its legitimate interest.

14. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not passed upon by the trial court.

15. **Constitutional Law: Appeal and Error.** A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal.

Appeal from the District Court for Saline County: VICKY L. JOHNSON, Judge. Reversed and remanded for further proceedings.

Kelly R. Hoffschneider, of Hoffschneider Law, P.C., L.L.O., for appellant.

Gregory C. Damman, of Blevens & Damman, for appellee REO Enterprises, LLC.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

Funke, J.

The Village of Dorchester, Nebraska (Dorchester), appeals the district court's order granting summary judgment for REO Enterprises, LLC (REO). In its order, the district court declared Dorchester's ordinance No. 684 unconstitutional because it treated tenants and owners of property differently when applying for utility services by requiring tenants to obtain a landlord's written guarantee that the landlord would pay any unpaid utility charges for the rented property. Dorchester claims that the district court erred in this declaration and that ordinance No. 684 does not violate the Equal Protection Clauses of the U.S. and Nebraska Constitutions. For the reasons set forth herein, we reverse the judgment and remand the cause to the district court for further proceedings.

## BACKGROUND

REO is a Nebraska limited liability company which owns residential rental property in Dorchester. Prior to May 1, 2017, tenants who leased REO's property applied for utility services with Dorchester, paid a deposit, and received water, sewer, and electrical services.

On May 1, 2017, Dorchester's village board passed ordinance No. 684 mandating the use of village utility services and setting forth terms for billing, collection of bills, and discontinuance of service. As relevant to the instant case, "Section 3-002: Consumer's Application; Service Deposit" provides:

> A. Every person or persons desiring utility services must make application therefor to the Village clerk, who shall require the applicant to make a service deposit and tap fees for water and sewer service in such amounts as set by resolution by the Village Board and placed on file at the Village office. . . . Utility services shall not be supplied to any house or private service pipe except upon the order of the utilities superintendent.
>
> B. Before a tenant's utility application will be accepted, the landlord shall be required to sign an owner's consent

form and agree to pay all unpaid utility charges for his
or her property.

In July 2017, Ange Lara entered into a lease agreement with
REO for the rental of REO's Dorchester property. Pursuant
to this agreement, Lara contacted Dorchester's village clerk
to apply for utility services and paid a $250 deposit with this
application. At that time, Lara was informed that there was a
prior, unpaid utility bill associated with a prior renter of the
property and that she would not receive the services until this
bill was paid and REO signed a form titled "Owner's Consent
and Guaranty of Payment for Unpaid Utility Charges for
Rental Property."

Lara told a representative of REO about her interaction
with the village clerk. An REO representative then contacted
representatives of Dorchester and was informed of ordinance
No. 684 and its requirement that REO sign the "Guaranty"
before Lara could receive utility services for the property. The
village clerk also reiterated the requirement that the prior ten-
ant's past-due bill be paid. REO responded to these require-
ments by asserting that ordinance No. 684 is invalid and that it
would not sign the "Guaranty."

Due to this noncompliance, Dorchester refused to provide
Lara utility services at the property in Lara's name. However,
Dorchester did begin to provide services to the property
through an account set up in an REO representative's name. At
the time of this action, Dorchester had retained Lara's deposit
and was continuing to provide utility services for the property,
still occupied and leased by Lara, through the REO representa-
tive's account.

In October 2017, REO filed a complaint seeking that the
district court declare ordinance No. 684 void and unenforce-
able and order Dorchester to pay REO's attorney fees and court
costs. REO alleged four claims as follows: (1) Ordinance No.
684 violated the Equal Protection Clauses of article 1, § 3,
of the Nebraska Constitution and the 14th Amendment to the
U.S. Constitution; (2) ordinance No. 684 violated the Equal

Credit Opportunity Act[1]; (3) ordinance No. 684 violated the special legislation provision of article 3, § 18, of the Nebraska Constitution; and (4) ordinance No. 684 violated Nebraska's Uniform Residential Landlord and Tenant Act.[2]

Dorchester filed an answer which claimed, in part, that REO's complaint failed to state a claim upon which relief could be granted and that REO's claims were barred in whole or in part by the doctrine of unclean hands, laches, waiver, and estoppel.

In May 2016, REO filed a motion for summary judgment claiming there were no genuine issues of material fact and it was entitled to judgment as a matter of law. Dorchester, in turn, also filed a motion for summary judgment, agreeing there were no genuine issues of material fact and claiming it was entitled to judgment as a matter of law.

Following a hearing, the district court entered summary judgment for REO and overruled Dorchester's motion. In its order, the court analyzed REO's claim that ordinance No. 684 violated the Equal Protection Clauses. First, the court found that residential tenants and owners of Dorchester property were similarly situated under ordinance No. 684 for equal protection purposes. The court noted that by requiring a landlord to be a cosigner to a tenant's utility obligations, but not requiring a residential owner to obtain a third-party cosigner, ordinance No. 684 treated tenants and owners differently. The court then found there was not a rational relationship between the difference in treatment and Dorchester's interest in collecting unpaid bills from tenants. Specifically, the court reasoned that Dorchester's policy was applied to tenants irrespective of their creditworthiness and ability to pay without taking into account the tenants' security deposits and the ability of Dorchester to impose liens on the rented property or provide other remedies to meet Dorchester's offered goal. Thus, the court determined ordinance No. 684 unconstitutionally violated the

---

[1] 15 U.S.C. § 1691 et seq. (2012).

[2] Neb. Rev. Stat. §§ 76-1401 to 76-1449 (Reissue 2018).

Equal Protection Clauses and, because it found this claim dispositive, did not discuss REO's remaining claims.

## ASSIGNMENT OF ERROR

Dorchester assigns, consolidated and restated, that the district court erred by finding that ordinance No. 684 violated the Equal Protection Clauses of the U.S. and Nebraska Constitutions.

## STANDARD OF REVIEW

[1-3] Interpretation of a municipal ordinance is a question of law.[3] Similarly, the constitutionality of an ordinance presents a question of law.[4] An appellate court independently reviews questions of law decided by a lower court.[5]

## ANALYSIS

### Equal Protection

[4-6] The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges.[6] Equal protection requires the government to treat similarly situated people alike.[7] It does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.[8] When a classification created by governmental action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, equal protection requires only that the classification rationally further a legitimate state interest.[9]

---

[3] *Wilkison v. City of Arapahoe*, 302 Neb. 968, 926 N.W.2d 441 (2019).

[4] *Dowd Grain Co. v. County of Sarpy*, 291 Neb. 620, 867 N.W.2d 599 (2015).

[5] *Wilkison, supra* note 3; *Dowd Grain Co., supra* note 4.

[6] *Lingenfelter v. Lower Elkhorn NRD*, 294 Neb. 46, 881 N.W.2d 892 (2016).

[7] *Id*.

[8] *Id*.

[9] *Id*.

Ordinance No. 684 creates two classifications relevant to the instant action: (1) residential tenants and (2) residential owners. REO does not claim, and the district court did not find, that tenants are a suspect class or that ordinance No. 684's difference in treatment affected a fundamental right. Additionally, we have not held that a specific application and collection structure for payment of utility services by tenants and landowners is a fundamental right. As such, and because the interests at issue are economic, we apply the rational basis test.[10]

[7-9] This court begins with a presumption of validity when passing upon the constitutionality of an ordinance.[11] Accordingly, under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.[12] The rational basis test, which is the most relaxed and tolerant form of judicial scrutiny of equal protection claims, is satisfied as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.[13]

In this three-part analysis, we first consider the policy reason for the classification.[14] Under ordinance No. 684, Dorchester requires residential tenants to provide written guarantees from their landlords but does not require similar third-party guarantees for residential owners. In requiring the written

---

[10] See *id.*

[11] *DeCoste v. City of Wahoo*, 255 Neb. 266, 583 N.W.2d 595 (1998).

[12] *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019); *Lingenfelter, supra* note 6.

[13] See *Lingenfelter, supra* note 6.

[14] *Id*.

guarantee, Dorchester claims it has a legitimate interest in maintaining a financially stable municipal utility by collecting from tenants who abscond without paying their bills when those bills are in excess of the tenant's security deposit. Dorchester argues that requiring a landlord's guarantee "'remind[s] each landlord owner of its obligations and liability to . . . Dorchester and will further the goal of collection by reducing the possibility that . . . Dorchester will be faced with the administrative expenses associated with repeatedly resorting to cumbersome and expensive foreclosure or collection proceedings.'"[15]

A village has the statutory authority to make and enforce all necessary rules and regulations in the use of its system of waterworks or water supply and the use of the water from such system.[16] Along with charges for the use of a village's sewer system,[17] a village has the power to assess and collect from its inhabitants rates for the use and benefit of water used or supplied to them which includes the authority to enforce liens upon the real estate where the water and sewer system are used or supplied.[18] A village also has the authority to contract to furnish electricity to any person or corporation.[19]

Pursuant to its authority to provide and charge for utility services, Dorchester has a legitimate interest in ensuring collection of accounts for these services. By requiring a landlord to guarantee any unpaid utility charges not paid by the tenant, Dorchester increases the likelihood that it will be able to collect payment for services with minimal additional collection costs even if the tenants move away and collection efforts from the tenants are unsuccessful. Such guarantee involves a third party who is tied to real estate located within Dorchester

---

[15] Brief for appellant at 13.

[16] See Neb. Rev. Stat. § 17-537 (Cum. Supp. 2016).

[17] See Neb. Rev. Stat. § 17-925.02 (Cum. Supp. 2016).

[18] See Neb. Rev. Stat. § 17-538 (Cum. Supp. 2016).

[19] See Neb. Rev. Stat. § 17-901 (Reissue 2012).

and against whom collection may be more easily pursued. This consideration does not equally apply when determining whether to require a third-party guarantee from a residential landowner where the utility customer owns the land at issue and cannot as easily avoid his or her obligations without abandoning the property to its creditors. We find ensuring payment for utility services is a plausible policy reason for the classifications requiring landlords' guarantees for tenants but not for residential owners.

[10] We next consider whether the legislative facts on which the classification is based may rationally have been considered to be true.[20] Where, as here, the record does not contain information regarding the adoption of an ordinance, statute, or other governmental action, we have analyzed the underlying legislative facts the governmental entity alleged to have considered when such basis is clearly apparent.[21]

Dorchester claims by requiring a landlord guarantee for tenants and not requiring a third-party guarantee for residential owners, it was recognizing that tenants are less likely to be creditworthy than owners and that collection from tenants who moved away is more difficult than from owners who are tied to the property within the village. In support of these alleged facts, Dorchester provided an affidavit from Dorchester's village clerk and treasurer. She explained that "[i]n the past, [Dorchester] spent substantial resources in trying to locate former residential tenant utilities customers that . . . left town with unpaid utility account obligations" and "collections agencies would be used to collect these unpaid utilities accounts [and] charge 50% of the amount collected." She also described that there remains an unpaid utility bill on REO's property in the previous tenant's name and that the location of the previous tenant is unknown.

REO argues the affidavit should be viewed with skepticism in that it was conclusory and self-serving and failed to include

---

[20] *Lingenfelter, supra* note 6.

[21] See *id.*

specific information supporting its conclusion. REO contends that there is no evidence that Dorchester ever conducted a study or analysis of utility bill payment tendencies in order to establish that tenants were any more likely than property owners to fail to pay utility bills and, if so, at what level. REO's argument is based upon the proposition that Dorchester had a burden to offer evidence in support of its alleged policy reason for the classification.

We first note the court granted summary judgment in favor of REO, and as such, Dorchester is entitled to have the evidence viewed in its most favorable light and have all reasonable inferences deducible from the evidence.[22]

[11] Additionally, as stated above, the burden is upon REO as a party challenging the ordinance to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.[23] The U.S. Supreme Court has explained, "A State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification."[24] The Court further explained, "'[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'"[25] Contrary to REO's argument, Dorchester was not required to present evidence to support the classification under ordinance No. 684, and instead, REO had the duty to disprove Dorchester's alleged factual basis or establish the facts were not reasonably conceivable.

As the district court correctly noted, individual residential tenants and owners are not intrinsically with or without creditworthiness. However, other jurisdictions have recognized

---

[22] See *JB & Assocs. v. Nebraska Cancer Coalition*, 303 Neb. 855, 932 N.W.2d 71 (2019).

[23] See, *Montoya, supra* note 12; *Lingenfelter, supra* note 6.

[24] *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993).

[25] *Id*.

an increased likelihood that an individual who rents a property may have less available reachable assets and resources than an owner who may have applied for and acquired debt to buy the property or had enough resources to buy the property outright.[26] When analyzing the underlying facts Dorchester relied on in enacting ordinance No. 684, the question is not whether such assertion is correct but whether it may rationally have been considered to be true.[27] Accordingly, the inherent increased likelihood of a tenant's lack of creditworthiness compared to a residential owners' creditworthiness is an appropriate consideration.

Even more compelling is Dorchester's allegation that administrative and collection costs associated with unpaid utility bills are more likely to increase when seeking payment for services provided to tenants versus residential owners. Tenants are connected to the property through a lease agreement which means their connection with that property ceases when they are no longer acting under the agreement. Dorchester noted in the village clerk's affidavit that, in the past, this lack of continuing connection with the property can result in Dorchester's spending "substantial resources" in trying to locate the tenant to collect on unpaid services.

REO argues that Dorchester does not define "substantial resources" expended to locate and collect from tenants in contrast to residential owners. However, evidence of a study and a precise comparison is unnecessary to support Dorchester's conclusion.[28] Residential owners own the property until they sell, abandon, or are removed. Dorchester, therefore, has a static source to contact and pursue collection from residential owners. It is rational to conclude that the costs associated

---

[26] See, *Midkiff v. Adams County Reg. Water District*, 409 F.3d 758 (6th Cir. 2005); *DiMassimo v. City of Clearwater*, 805 F.2d 1536 (11th Cir. 1986); *Chatham v. Jackson*, 613 F.2d 73 (5th Cir. 1980).

[27] See, *Montoya, supra* note 12; *Lingenfelter, supra* note 6.

[28] See *id.* See, also, *Heller, supra* note 24.

with locating a residential landowner is likely to be less than locating a previous tenant.

Finally, we must consider whether the relationship of the classification to its goal is so attenuated as to render the distinction arbitrary or irrational.[29]

[12] The village clerk's affidavit claims Dorchester has expended substantial resources in pursuing collection of unpaid utility accounts from tenants who have moved away, including costs associated with locating the tenants and collection agencies. Landlord guarantees help to ensure that Dorchester can minimize these costs because the landlords are more directly tied to property within Dorchester and the guarantees provide another party to account for the amounts due. Such a third-party guarantee does not equally apply to residential owners who do not have a landlord third-party relationship and are already tied to the serviced property. Social and economic measures violate equal protection only when the varying treatment of different groups or persons is so unrelated to the achievement of any legitimate purposes that a court can only conclude that the Legislature's actions were irrational.[30] Here, we find ordinance No. 684's treatment of tenants and residential owners was sufficiently related to Dorchester's stated purpose so as not to render the distinction arbitrary or irrational.

In *DeCoste v. City of Wahoo*,[31] the city enacted an ordinance which authorized collection of landfill management fees from city residents by adding the fees to the electrical bills of "'all appropriate electrical customers.'" Because some city residents such as those within units of multiple-unit apartment complexes did not have individual electrical meters and electrical bills, a number of these residents did not have to pay the landfill management fees.[32] We determined this

[29] See *Lingenfelter, supra* note 6.

[30] *Citizens for Eq. Ed. v. Lyons-Decatur Sch. Dist.*, 274 Neb. 278, 739 N.W.2d 742 (2007).

[31] *DeCoste, supra* note 11, 255 Neb. at 271, 583 N.W.2d at 599.

[32] *Id.*

difference in treatment violated equal protection because the classifications did not rationally relate to the city's objective of funding its landfill management.[33] We reasoned that whether or not a residence had an electrical meter did not relate to landfill management and was wholly irrelevant to the city's stated objective.[34]

The ordinance at issue in *DeCoste* is different than the landlord guarantee requirement under ordinance No. 684, which directly relates to Dorchester's objective. Dorchester provides utility services to properties and charges for the services. Ordinance No. 684 requires that the property owners of the residences who are provided the services, including landlords and residential owners, agree to the responsibility for payment of these utility charges. Having a landlord guarantee increases the likelihood that these bills are paid.

REO argues the landlord guarantee requires a landlord to agree to cover unpaid bills for services the landlord will not receive. REO also claims allowing Dorchester to require a landlord guarantee would have far-reaching negative implications and allow municipalities and power districts to require similar guarantees for rented farmland, industrial land, and commercial land which could greatly increase the potential liability of those landlords.

This argument ignores the fact that a landlord receives a benefit from the property's having access to and use of utility services in that a property which has access to utilities and in which this access is reliable and consistent has an increased property value.[35] The statutory scheme also assumes a property owner is a relevant party to the availability and use of utilities at a property in permitting the imposition of a lien against the owner's property when a tenant fails to pay.[36] Finally, whether

---

[33] See *id*.

[34] *Id*.

[35] See *Chatham, supra* note 26.

[36] See, § 17-925.02; § 17-538.

ordinance No. 684 may influence other municipalities and power districts to require landlord guarantees which may have their own expanded implications is immaterial to the question of whether Dorchester's landlord guarantee requirement furthers the legitimate interest of ensuring collection of accounts for the provision of utility services to Dorchester residents.

REO also argues Dorchester "is already adequately protected by its ability to require the tenant to make a deposit . . . to cover the last month's bill and to place a lien on the property for any amounts that remain unpaid for water and sewer services after application of the deposit."[37] REO contends Dorchester can further limit its potential risk of nonpayment over the deposit amount by promptly shutting off utility services when a tenant fails to pay.

[13] While Dorchester may have had alternate avenues to address its goal of ensuring payment of utility bills through higher security deposits and collecting from liens imposed on properties, the rational basis test does not require a governmental entity to choose a specific course of action to address its legitimate interest. REO has pointed to no authority under a rational basis review that would require a municipality to choose an individual means of pursuing its legitimate interest. Instead, the question remains whether the classification rationally furthers a legitimate state interest.[38]

We find *DiMassimo v. City of Clearwater*[39] instructive. There, the 11th Circuit evaluated a requirement that a landlord join in a tenant's application for utilities and found the requirement was obviously related to the city's legitimate purpose of maintaining a financially stable municipal utility. The court explained that "a landowner, whose property is readily subject to liens and foreclosure may be rationally presumed to be more readily held to account as the ultimate guarantor of the bills

---

[37] Brief for appellee at 18.

[38] See *Lingenfelter, supra* note 6.

[39] *DiMassimo, supra* note 26.

than a tenant who may freely abandon the lease, leaving behind only his outstanding debts."[40] In addressing the plaintiff's argument that the city already had adequate protection through liens and the ability to require greater security deposits, the court stated:

> Requiring a landlord's joinder in the application for utilities serves to remind each owner of his obligations and liability to the City and therefore, furthers the goal of collection by reducing the possibility that the City will be faced with the administrative expenses of repeatedly resorting to cumbersome and expensive foreclosure proceedings. A financial deposit sufficient to provide the City with the same degree of security would indeed be burdensome to any potential tenant.[41]

REO cites *Golden v. City of Columbus*[42] and *O'Neal v. City of Seattle*[43] for the proposition that classifications and disparate treatment of tenants and owners is not rationally related to a municipality's interest in collecting unpaid utility debts. However, these cases are distinguishable because they involve whether a municipality could require a tenant to pay a previous, unpaid utility bill for the initiation and continuation of service even though the tenant had not received the previous service and had no previous relationship with the property.[44]

In *Golden*, the Sixth Circuit analyzed a city policy where, after a tenant moved into a property which was already receiving water services, the city would terminate the services if the landlord owed for a prior tenant's water usage.[45] The city would inform the tenant that water services would only recommence once the landlord satisfied that debt. The *Golden* court

---

[40] *Id.* at 1541.

[41] *Id.* at 1542.

[42] *Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005).

[43] *O'Neal v. City of Seattle*, 66 F.3d 1064 (9th Cir. 1995).

[44] *Golden, supra* note 42; *O'Neal, supra* note 43.

[45] *Golden, supra* note 42.

analyzed the equal protection claim solely with regard to the city policy's irrationally differential treatment of tenants whose landlords owed the city for water service and other tenants whose landlords did not have such debt. The court found the policy violated equal protection because it treated tenants who moved into properties and whose owners were encumbered with preexisting utility debts differently from properties that were not.[46] The court expressed no opinion regarding the policy's differential treatment of landlords and tenants.[47] It is noteworthy that the court left undisturbed the city's requirements that a tenant obtain a landlord's consent prior to receiving utility services and that a property owner is liable for unpaid utility bills of a tenant.[48]

Similarly, in *O'Neal*, the Ninth Circuit analyzed a city policy of refusing to provide water service to new tenants when there is a balance due for prior water service to the premises.[49] The *O'Neal* court also found the policy treated tenants differently based upon whether the properties were encumbered with preexisting utility debts. The court determined that this scheme was divorced from the reality of legal accountability for the debt because the person directly penalized by the scheme was not the debtor but an innocent third party with whom the debtor contracted.

Requiring a tenant to pay previous, unpaid utility bills to initiate or continue service where the tenant was not a party to those services nor connected to the property is different from Dorchester's requirement that a tenant obtain the landlord's guarantee prior to the initiation of service. Unlike the tenants in *Golden* and *O'Neal*, landlords are connected to the property for which the utilities are being provided and, as discussed, receive a benefit from the availability and use of utilities at

---

[46] *Id.* See, also, *O'Neal, supra* note 43.

[47] *Golden, supra* note 42. See, also, *Midkiff, supra* note 26.

[48] *Golden, supra* note 42.

[49] *O'Neal, supra* note 43.

their property. Landlords have agency in minimizing their risk by choosing a creditworthy tenant, mandating in the lease that the tenant promptly pay all utility bills, and terminating the lease should the tenant fail in that duty.

On this third consideration, we find Dorchester's goal of ensuring the collection of utility accounts through a cost-effective means is sufficiently related to, and not too attenuated from, ordinance No. 684's requirement that a residential tenant obtain a landlord's guarantee of payment while not requiring a residential owner to obtain a third-party guarantee.

In consideration of all of the above, we find that ensuring collection of utility bills was a plausible policy reason for requiring tenants to obtain landlord guarantees but not requiring residential owners to obtain third-party guarantees. We further find that this classification was based on facts which Dorchester could rationally have considered to be true and that the classification was sufficiently related to the goal of ensuring payment of utility bills so as not to render the treatment arbitrary or irrational. Accordingly, ordinance No. 684's requirement that a residential tenant obtain a landlord's guarantee for initiating utility services does not violate the Equal Protection Clauses of the U.S. and Nebraska Constitutions and the district court erred.

## Additional Claims

Even though the district court declined to address REO's remaining claims, REO asks that we address them on appeal, which claims include whether ordinance No. 684 violated the Equal Credit Opportunity Act; violated article 3, § 18, of the Nebraska Constitution; and violated Nebraska's Uniform Residential Landlord and Tenant Act.

[14,15] An appellate court will not consider an issue on appeal that was not passed upon by the trial court.[50] As to constitutional claims specifically, we have held that a constitutional issue not presented to or passed upon by the trial

---

[50] *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019).

court is not appropriate for consideration on appeal.[51] Based upon these established rules and REO's failure to cross-appeal, we decline to address REO's remaining claims on appeal and remand this cause to the district court for further consideration of the remaining claims.

## CONCLUSION

Because the requirement under ordinance No. 684 that tenants must obtain a landlord guarantee in order to initiate utility services did not violate the Equal Protection Clauses of the U.S. and Nebraska Constitutions, we reverse the judgment of the district court and remand the cause for further proceedings to consider the remaining claims.

Reversed and remanded for
further proceedings.

---

[51] *Capitol City Telephone v. Nebraska Dept. of Rev.*, 264 Neb. 515, 650 N.W.2d 467 (2002).